ATTORNEY-GENERAL, EX REL. BLISS et al., respondents,

*v.*

LINDEN CEMETERY ASSOCIATION et al., appellants.

[Argued November 19th, 1915.    Decided March 6th, 1916.]

1. The owner of a tract of land conveyed it for cemetery purposes to a cemetery association incorporated under the General Cemetery act of this state, the sole consideration for the conveyance being the covenants expressed in the deed, the first of which was that the association should deliver to the grantor a specified number of lot-entitling shares, giving the holders thereof their *pro rata* lien and claim upon the land-purchase fund of the association of at least one-half of the proceeds of the sale of all burial plots, in the tract conveyed to it for conversion into burial plots; and the second of which covenants was that the association should pay periodically in cash to the grantor, his heirs, administrators, executors and assigns ten per cent. of the gross proceeds of the sale, lease or loan of each plot or of any use thereof or interest therein made by it from the land conveyed to it.—*Held*, that in view of the fact that there was a full disclosure of the purchase-price to all parties who then were or thereafter might become interested, manifested in the deed itself and spread upon the public records, the defect of the second covenant was, not that it provided a secret or illegal profit for the grantor, but that, because the amount of such profit was not liquidated, the covenant was one that it was not within the statutory power of the grantee association to make, being a covenant to pay perpetually a percentage of the price obtained for each of its lots.

2. Normally, the remedy would be the rescission of the contract notwithstanding the conveyance, the vendee being thereby absolved from its illicit covenant, and the vendor having his land restored to him, but if for valid reasons this cannot be done, it still furnishes the criterion by which the rights and equities of the parties are to be worked out.

3. In the present case as this normal remedy cannot be applied because of the burial uses to which the land has been put with the acquiescence of the grantor, none the less the conveyance as such must theoretically fall within the excission of its consideration, leaving the title of the grantee to rest upon the estoppel of the grantor to deny the perpetual dedication of the land to the uses for which it was conveyed as fully to all intents as if the deed of conveyance were valid and operative.

4. The exscinded covenant provided for the profit that it was agreed the grantor should have, but what that profit should be the parties themselves never fixed at any particular sum; hence, inasmuch as such

sum cannot be ascertained from the covenant itself, it must be held by a court of equity to be a reasonable sum, in view of the services of the grantor and their value to the grantee, less any credits to which the grantee is entitled. Such a sum, when ascertained by a reference, or otherwise, should be treated as unpaid purchase-price for the land until extinguished by payment in gross or by a percentage from the price of lots, as provided in the covenant that was extra-statutory solely because the amount so to be was unliquidated.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Howell, whose opinion is reported in *83 N. J. Eq. 494.*

*Messrs. Vail & McLean,* for the appellants.

*Mr. Abram H. Cornish* and *Mr. Hugh B. Reed,* for the respondents.

The opinion of the court was delivered by

GARRISON, J.

On January 29th, 1901, William F. Smith, of New York, having acquired by purchase from the Winans estate a tract of land, in Union county, New Jersey, conveyed it for cemetery purposes to the Linden Cemetery Association, a New Jersey corporation, that had, more than a year before, been incorporated under the General Cemetery act of this state by the Winans family and certain other persons interested either in the establishment of a cemetery or in bringing about the sale of the Winans property. Of these incorporators Smith was not one and with them he had no connection at the time the association was organized, and even at a later period his only connection was that of the purchaser of the Winans tract and its conveyance to the already organized cemetery association. Smith paid $5,500 in cash for the tract, on which were mortgages amounting to $32,000. The land, therefore, was acquired by Smith at a valuation of $37,500, and in order to reap a profit, which was his sole object in engaging in the transaction, it was necessary that he sell the property to the association at a larger price. Owing,

however, to the fact that the association had no money and no means of raising any, the conveyance to it was made by Smith without the payment of any money whatsoever either for the land itself or for his profit in the transaction, both of which were taken care of by two covenants in the deed, which, together with other covenants, constituted the sole consideration for the conveyance.

These two covenants were as follows:

"The party of the second part, in consideration of the conveyance to it of the premises hereinafter described, covenants, promises and agrees to and with the parties of the first part:

"1. To deliver to said William F. Smith nine thousand shares of the Linden Cemetery Association made out in the name of C. O. Smith at the ensealing and delivery of it by said first parties of this indenture, said shares giving the holders thereof their *pro rata* lien and claim upon the land-purchase fund of said association, composed under the laws of New Jersey of at least one-half of the proceeds of the sale of all burial plots in the grounds of said association conveyed to it by these presents for conversion into burial plots.

"2. To pay semi-annually in cash to said William F. Smith, his heirs, administrators, executors and assigns, one-tenth part of the gross proceeds of the sale, lease or loan of each burial plot or of any use thereof or interest therein, made by said Linden Cemetery Association, party of the second part, from the land hereinafter conveyed to said association by this indenture."

The decree brought up by this appeal directed that the second of these covenants be struck out of the deed of conveyance, and this direction is the sole subject of the appeal.

That this covenant, which was in lieu of cash, was, with the acquiescence of all parties, the profit that Smith was to take, is clear from the evidence; the fact that it was to be distributed by Smith between himself and three others is a circumstance that does not affect the equitable rules applicable to the transaction saving as it has some bearing upon the right of Smith to take a profit and the amount thereof.

It has been stated that the cemetery scheme originated with the Winans family and their local connections. This was in 1899. Some of the Winans owned the land; others with their neighbors organized the association that was to purchase the land, to which end options were given prior to the organization of the

association. The association was incorporated, the necessary license of the township authorities was obtained and the permit of the board of health was secured, and by the time all of this was done, the options had expired and the owners refused to renew them or to deal otherwise than upon the basis of a cash payment for their equity in the land over and above the mortgages. The association had no money, and no means of raising any, and the incorporators were either unable or unwilling to lock up their own money by paying for the land which when conveyed to the cemetery association would be repaid, if at all, only by the slow process provided by the General Cemetery act, viz., the appropriation of

"one-half at least of the proceeds of all sales of lots to the payment of the purchase money of the lands acquired by the association until the whole purchase money shall be paid."

In this *impasse* that threatened the life of the scheme, Vernette E. Prentice, who was locally connected with it, interested one William F. Smith, of New York, in the purchase of the Winans tract, with a view of selling it to the cemetery association. Smith took the matter up, and in order to finance it, interested his son C. O. Smith, who agreed to put in a part of the required cash. Smith also interested Roswell A. Benedict, a Connecticut lawyer, first as an attorney and afterwards as a contributor of cash. When Smith had secured the requisite amount of cash, to wit, $5,500, the question arose as to how the purchase price to the association was to be paid or secured by it, seeing that it had no money, no stock and no power to mortgage even for unpaid purchase-money. This practical and legal problem was left largely to Mr. Benedict, who, after devoting considerable time and labor to the New Jersey statutes and decisions (the case of *East Ridgelawn Cemetery Co.* v. *Frank* (1910), 77 *N. J. Eq. 36*, not having at that time been decided), finally evolved the scheme of payment that eventually took shape in the deed of William F. Smith to the cemetery association containing the two covenants that have been quoted. That Smith, who represented himself and his associates, was entitled to a fair profit as a recompense for the indispensable services they had rendered is clear,

the only requirements demanded by the most rigorous rule being that such profit should bear a reasonable relation to the value of the services, and that it should be fully disclosed and agreed to by the other parties in interest. While Smith had bought the land for the purpose of selling it to the association, he was in no sense its agent; the money he used was his own and not that of the association or its promoters or incorporators, and it is not shown or claimed that he obtained any reduction in price, by reason of the ulterior purpose to which the land was to be devoted. In a sense, the cash that Smith put into the transaction was risked when he conveyed his title to a company that could neither repay nor secure it, and where its eventual repayment depended upon his ability to sell for cash a large number of lot-entitling shares and the slow crediting of ten per cent. from the future sale of lots by the association.

That the purchase price included a profit to Smith was known to all the parties interested, to whom the result thus brought about came as a happy solution of the very formidable problem of how an association that had no money was to acquire the lands of an owner who would sell only for cash.

That there was a full disclosure to all parties then interested, or who might thereafter buy into the scheme, cannot be questioned, in view of the fact that the transaction was set forth at length in the deed itself and at once spread upon the public records.

The defect, therefore, of the covenant that was stricken out of the deed by the court below, was not that it provided a secret or illegal profit for the grantor, but that, because the amount of such profit was not liquidated, the covenant was one that it was not within the statutory power of the grantee to make. *East Ridgelawn Cemetery Co.* v. *Frank, 77 N. J. Eq. 36.*

In so far, therefore, as the decree is based upon the first-mentioned considerations, it rests upon an unsound foundation, and, in so far as it is based upon the last-mentioned consideration, the remedy decree is inequitable and beyond the power of the court.

The court of chancery properly decided that the covenant to pay perpetually a percentage of the price obtained for each of its lots was one that an association incorporated under the Gen-

eral Cemetery act could not lawfully make, and as to the sound-
ness of this decision, and the grounds on which it rests, we have
nothing to add to the discussion of the question by Vice-Chancel-
lor Stevens in *East Ridgelawn Cemetery Co.* v. *Frank, supra.*

In the present case, the decree is that the deed of conveyance
in which the extra-statutory covenant is made as part of the con-
sideration be reformed by striking out and eliminating there-
from the covenant. This is to say, that a grantee who has ob-
tained a conveyance of land by agreeing to pay therefor in a par-
ticular manner which is beyond his legal capacity may keep the
land without paying for it at all. This, of course, cannot be so.
Normally, the remedy would be the rescission of the contract,
notwithstanding the conveyance, the vendee being thereby ab-
solved from its illicit covenant, and the vendor having his land
restored to him. If, for valid reasons, this cannot be done, it
still furnishes the criterion by which the rights and equities of
the parties are to be worked out. In the present case, this normal
remedy cannot be applied because of the burial uses to which the
land has been put with the acquiescence of the grantor. None
the less, the conveyance as such must theoretically fall with the
excission of its consideration, leaving the title of the grantee to
rest upon the estoppel of the grantor to deny the perpetual dedi-
cation of the land to the uses for which it was conveyed as fully
to all intents as if the deed of conveyance were valid and opera-
tive. *Close* v. *Glenwood Cemetery Association, 107 U. S. 474.*

Of such deed an essential feature was the payment of a part
of the consideration in a particular way, and if that way is ob-
noxious to the statute law, some other way must be found by
which the contract of the parties as expressed in the deed shall as
nearly as possible be carried out. Any objection by the com-
plainant to this course is met by the most fundamental of all the
maxims—"He who seeks equity must do equity."

The exscinded covenant provided for the profit that it was
agreed the grantor should have, but what that profit should be
the parties themselves never fixed at any particular sum; hence,
inasmuch as such sum cannot be ascertained from the covenant
itself, it must be held by a court of equity to be a reasonable
sum, in view of the services of the grantor and their value to the

grantee, less any credits to which the grantee is entitled. Such a sum, when ascertained by a reference, or otherwise, should be treated as unpaid purchase price for the land until extinguished by payment in gross or by a percentage from the price of lots as provided in the covenant that was extra-statutory solely because the amount so to be paid was unliquidated.

The decree of the court of chancery, so far as it is challenged by the petition of appeal, must be reversed, to the end that it may be corrected in accordance with the views herein expressed.

Nothing has been said as to the theory of the amended bill of complaint, which was that of an administration of a charitable use. The question whether or not lands held by cemetery associations, incorporated under our General Cemetery act, are devoted to a charitable use, in the legal sense of that term, need not be decided as the basis of jurisdiction in this case.

The estoppel of the grantor to deny the dedication of his land to the corporate purpose, and the severance of the legal and equitable titles involved in the doctrine thus invoked, exhibit a trust relation that amply justifies the exercise by a court of equity of that branch of its primary jurisdiction when the necessary parties are before it and the necessary facts are pleaded.

Cases illustrating this doctrine, under a variety of circumstances, are referred to in the *Century Digest, tit. "Estoppel"* *277*, and in the *American Digest* and its supplements under the key number *"Estoppel" 94 (1)*.

The decree of the court of chancery is reversed for modification.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, KALISCH, BLACK, TERHUNE, HEPPENHEIMER, WILLIAMS, TAYLOR—12.