ATTORNEY-GENERAL, EX REL. WILLIAM BLISS et al., complainants,

*v.*

LINDEN CEMETERY ASSOCIATION et al., defendants.

[Argued November 23d, 1917.   Decided June 3d, 1918.]

On reference to a master to ascertain and report what is the "reasonable sum" to be payable as the purchase price of lands devoted to cemetery uses in accordance with the previous decision of this court in this cause (see *85 N. J. Eq. 501*)—*Held*, that it is proper to ascertain the fair value of the lands as of the date of the receivership, and to award the stipulated ten per cent. of that value payable out of sales as made and without interest, that method appearing to be satisfactory to the parties entitled to compensation for the property.

On appeal from an order advised by Vice-Chancellor Backes.

*Mr. Abram H. Cornish* and *Mr. Hugh B. Reed,* for the appellants.

*Messrs. Vail & McLean,* for the respondents-complainants.

The opinion of the court was delivered by

PARKER, J.

Pursuant to our former opinion in this case, which is reported in *85 N. J. Eq. 501,* there was a *remittitur* to the court

of chancery requiring that court "to ascertain what will be a reasonable sum to be paid to the grantor, or his assigns, for services and profit on the purchase and sale of said property, and their value to the grantee, less any credits to which the grantee is entitled. And that when such sum is ascertained it shall be treated as unpaid purchase price of the land until extinguished by payment in gross or by percentage from the price of lots, as provided in the said covenant, which covenant is declared to be extra-statutory solely because the amount to be paid to the grantor was unliquidated." The court of chancery, in adopting this decree as its own, referred it to a master to ascertain what this reasonable sum should be, and also any credits to which the grantee was entitled by reason of payments made on account of the covenant, or otherwise. The master, after taking testimony and other evidence, and hearing argument, reported that the opposing claims made before him were as follows: For the Smith contingent, that the actual value of the land for cemetery purposes, so far as available therefor, and for ordinary purposes as to the remainder, be ascertained, and ten per cent. thereon be fixed as the amount to which the Smith party were entitled, being the percentage stipulated in the covenant, and to be payable out of the proceeds of sales of lots from time to time; that they claimed such total value was $1,822,000 and argued for an award of ten per cent. thereon. On the other hand, the claim of the receiver was that claimants were entitled only to payment of reasonable compensation for the services and profit of Smith and his aides, "having in view the time spent for services actually rendered and their value to the grantor" (doubtless, meaning grantee). The master, without considering whether the valuation claimed for the land was a reasonable one, adopted the receiver's theory and awarded a total of $4,350 and interest as the gross amount payable for services and profit. It is clear, from the language of his report, which need not be here quoted, that the bulk of this amount was purely for services as of employes or agents, and that "profit" cut no particular figure.

On exceptions to this report, the vice-chancellor overruled the finding and held that as the covenant was declared by this court to be extra-statutory only because the amount to be paid was un-

liquidated, but that in its moral aspect it had the approval of this court, and percentage as a basis of calculation is not looked upon with disfavor (we quote, substantially, the language of his conclusions), the theory of claimants was the correct one, and he, accordingly, sustained the exceptions and sent the matter back to the master for a further report in accordance with his views. From the order advised by him in this regard the present appeal is taken.

We think the principle laid down by the learned vice-chancellor, so far as quoted above, was clearly in accordance with our former ruling. We expressly said in the opinion that Smith and his associates were entitled to a fair profit for the services they had rendered; that the profit should bear a reasonable relation to the value of the services; that Smith was in no sense the agent of the cemetery association; that in a sense he risked the cash that he put into the transaction; that the contract of the parties should be carried out as nearly as the statute would permit, inasmuch as a restoration to the *status quo* was impracticable; and that the only legal defect in the contract was the fact that the purchase price, and hence the amount of profit, was not liquidated. Apart from this, no legal or equitable objection was perceived either to ten per cent. on proceeds of sales as a rate of compensation for profit and services, or to its payment in installments as sales were made, the fact that such payment should wait on the sales no doubt being an element in fixing the rate. The position taken by the claimants makes it possible to utilize the ten per cent. rate. The plan as agreed on between the parties was to pay ten per cent. of the gross proceeds of sales from time to time, until the property should be sold out at an expected profit over cost and running expenses. This plan fails because the total amount of the ten per cent. was not ascertained. If it could have been so ascertained when the deed was made, the consideration of the deed would have been that amount payable in installments of ten per cent. of sales as made, which, if turned into cash at the delivery of the deed, would have been the present value of such installments at a proper rate of interest. In either aspect the consideration would have been a lawful one because its amount was known and stated; and in

either aspect it corresponds to what the parties agreed on; the difficulty being in its ascertainment because the time and amount of installments were a matter of pure speculation. Is there, then, a way of reaching a substantially identical result? The plan advocated by the claimants and approved by the vice-chancellor is that an appraisement be made of the lands, and that ten per cent. of this be ascertained as a gross sum to which claimants are ultimately entitled and (to adopt the language of the master's report) ten per cent. of the proceeds of future sales be set apart for the benefit of William F. Smith and his assigns as the sales are made, until the said sum is paid. This seems to be a practical way of disposing of the matter, and we assent to it with two qualifications—the first, that no interest be payable on the unpaid balance, for reasons already stated, and secondly, that the appraisal be made as of the date of the receivership, at which time the original scheme broke down.

This results substantially in an affirmance of the order brought up; but that order lacks precision, as it seems to depend for its effect on a reference to the conclusions of the vice-chancellor. A new order of reference should be made in accordance with the views we have expressed.

TRENCHARD, J. (dissenting).

I do not agree with the majority of the court. My view is that the special master was right and that the exceptions to his report in the court below should have been overruled.

In construing a *remittitur*, or in determining the action to be taken thereon where its directions are incomplete, the lower court should look to the reasons stated in the opinion of the appellate court and be governed thereby. Especially is this true when the remand (as in the present case) is for further proceedings in accordance with the opinion, for in such case the opinion is practically a part of the mandate. Considered in the light of the opinion (*85 N. J. Eq. 501*), I think that the construction adopted by the special master was right. To find that he was wrong (as the majority opinion does), it seems to me to be necessary to ignore the really controlling passages of the

opinion of this court to which we must look for aid in constru-
ing the *remittitur.* An examination of that opinion shows that
Smith "was entitled to a fair profit as a recompense" for his
*"services;"* that covenant No. 2 (with which alone we are con-
cerned) was intended to provide for "the profit that Smith was
to take;" that, whilst the covenant was *ultra vires,* the land
could not be kept without paying Smith's profit; that "nor-
mally the remedy would be the *rescission* of the contract, not-
withstanding the conveyance, the vendee being thereby absolved
from its illicit covenant, and the vendor having his land restored
to him; if, for valid reasons, this cannot be done, it still fur-
nishes the *criterion* by which the rights and equities of the par-
ties are to be worked out;" that for valid reasons the normal
remedy cannot be applied; that the amount of Smith's profit
*"cannot be ascertained from the covenant itself;"* that the
amount is "to be a reasonable sum, in view of the services of the
grantor and their value to the grantee, less any credits to which
the grantee is entitled."

Obviously, that means that *rescission is to furnish the cri-
terion* by which the rights of the parties are to be worked out;
that since the things which Smith gave, *i. e.,* land and services,
cannot be restored, he must have their value, not as of the present
time, but as of the time when rendered. For reasons set forth
in the opinion the court was concerned only with the value of
the *services.* No confusion should result from the use of the
words "profit" and "services," interchangeably in the opinion.
The court designated the thing Smith bargained for as "profit"
and the thing which he gave as "services," and pointed out that
the bargaining for a profit was legitimate, but the form in which
it was cast was illegal, and, consequently, Smith could not have
the profit bargained for in the *covenant,* but must have profits
commensurate only with what his services were worth, because
he gave services and not profits. Mr. Justice Garrison, in
writing the opinion of this court, made plain the method by
which the amount was to be ascertained by saying: "Hence, in-
asmuch as such sum (of profits) cannot be ascertained from the
covenant itself, it must be held by a court of equity to be a rea-
sonable sum in view of the services of the grantor and their value

to the grantee." He did not say that Smith was to be paid ten per cent. of the present value of the land, nor a word about ascertaining the value of the land as of the date of the receivership. If any such course had been intended it would not have been necessary to ascertain the value of Smith's services, because there was no relation between the value of such services and the value of the land in its present condition after development by the expenditure of hundreds of thousands of dollars by the association. The value of the services was not to be ascertained by the final result of the enterprise. Their value was to be determined by ascertaining what it would have cost the grantee at the time they were rendered to have had them duplicated. Such was the method adopted by the special master. I therefore vote to reverse the decree which sustained the exception to his report.

I am requested by Mr. Justice Black and Judge Williams to say that they concur in these views.

*For affirmance*—SWAYZE, PARKER, BERGEN, MINTURN, KALISCH, WHITE, GARDNER—7.

*For reversal*—TRENCHARD, BLACK, HEPPENHEIMER, WILLIAMS—4.